FORBES SHAW *vs.* JOHN WALLACE and JAMES McKENNA.

1. An agreement respecting a mine and tract of land, held to be a lease of the surface, but not of the mine.

2. The general principle, that a lease of land carries with it the mines upon the land, applies only where the contract relates to the land generally, with-out exception or reservation.

3. *Held,* that a contract to raise ore from the mine, at a stipulated price per ton, though it contained a clause that the mines were to be worked in a proper and systematic manner, to the satisfaction and approval of the over-seers appointed by the owner, nevertheless gave to the occupant such an ex-clusive possession of the mine, as enabled him to maintain trespass against the owner.

4. A contract by which a party is authorized to raise ore out of the mines on a designated tract of land, at a stipulated price, confers no authority to open new mines, or to sink new shafts or slopes, except so far as such shafts or slopes may be necessary to the proper and successful working of the mines already open.

5. In an action of trespass by the occupant of a mine and mining tract, under such contract, against the owner, for trespass in entering upon the tract, and opening a new mine or shaft, it is error to instruct the jury, that the proper measure of damages was such profits as the plaintiff would have realized by raising the ore which was raised by the defendant, at the rate per ton which the plaintiff was entitled to receive under his contract.

6. Unless it appeared in evidence that the acts of the defendant interfered with the beneficial working of the plaintiff's mine, the plaintiff was entitled to nominal damages only.

---

Error to the Morris Circuit Court.

An action of trespass *quare clausum fregit* was brought in the Morris Circuit Court, by John Wallace and James McKenna, against Forbes Shaw.

The declaration contained three counts.

The first count avers that the defendant on the 1st day of May, 1850, and on divers other days, &c., broke and entered the close of the plaintiffs, called the Hance and Dickerson mine, in Randolph township, containing forty-one acres, and dug and sunk divers pits, shafts, and holes, and from thence took large quantities of earth, soil, stones, iron ore, and other ore of the plaintiffs, to wit, 5000 tons of iron ore of the value of $5000, and carried the same away, and converted it to his own use.

The second count charges the defendant with breaking and entering the same close at same time, and trampling down, consuming, and spoiling the grass and herbage there growing, of the value of $30, and with taking and carrying away earth, stones, and ore of the like quantity, quality and value, as mentioned in the first count.

The third count avers that defendant, at same time, broke and entered a certain other iron ore mine or vein of ore of the plaintiffs, called the Hance and Dickerson mine, and took possession of it, and kept possession, without the leave or license, and against the will of the plaintiff, to wit, from the 1st day of June, 1851, till the commencement of the suit, and dug out of said mine or vein 5000 tons of ore, and converted the same to his own use, and prevented and hindered the plaintiffs from having possession, occupation, and use of said mine or vein, and from working the mine and raising the ore, to wit, 5000 tons of ore, which otherwise the plaintiffs could and would have raised from the said mine or vein; and the plaintiffs were thereby deprived of, and obliged to lose, and did lose, divers great gains, profits, and advantages, which would otherwise have accrued to them from raising ore from said vein, and from disposing of the same, as they could have done.

To this declaration, the defendant pleaded the general issue.

The plaintiffs had possession of the premises under an agreement made by them with one David Thomas. While the plaintiffs were in possession, the defendant entered upon the premises, under a contract with the said David Thomas, sunk a shaft, and commenced working a new mine. The plaintiffs claimed that, by virtue of their agreement with Thomas, they had the exclusive possession of the premises, including the mines and surface of the soil.

The agreement is as follows :

"Articles of agreement, made and executed this seventh day of May, A. D. 1850, between John Wallace, Peter Kinlock, and James McKenna, all of the county of Morris, in the state of New Jersey, of the first part, and David Thomas, of the village of Catasaqua, in the county of Lehigh, and commonwealth of Pennsylvania, of the second part, witnesseth, that the said parties of the first part, the survivors and survivor of them, severally promise and agree to raise a quantity of clean and merchantable iron ore, not less than 5000 tons per annum, during the term of two years, commencing from the first day of May, now past, out of the mines on the land and premises of Thomas Earp and Theodore Mitchell, in the township of Randolph, in the county of Morris, in the state of New Jersey, which said premises are known by the name of the Hance and Dickerson mine, and were conveyed by said Hance and Dickerson to said Earp and Mitchell, containing forty-one acres, be the same more or less, and deliver said ore at a convenient place on the mine bank. Said parties of the first part to have the privilege of entering on said premises, and commencing operations under this agreement at any time previous to said first of May. And the said David Thomas, for himself, his executors, and assigns, doth covenant and agree to remove said ore from said bank to the Morris canal at his cost and expense, their to be weighed by his agent or overseer, and to allow

for the same $1.25 for every ton of the weight of 2240 pounds of clean and merchantable ore, free from dirt, rock, and other impurity, payable to them in monthly payments, as follows : All the ore delivered during any month at the canal, and there weighed as aforesaid, to be paid for at the end of said month ; and the said David Thomas will use due diligence in the hauling away of said ore, so as not to cause any unreasonable accumulation thereof at the said bank ; and the said David Thomas further agrees to find the whim, chains, timber, and planks required by the said party of the first part for their operations under this agreement, and to permit the said party of the first part, to use and occupy the dwelling house and smith shop on the said premises, and will also find a stable for their use ; and further, will permit them to use the tops of trees that shall or may be felled on said premises, for the use of the mine for fuel for the hands occupying said house ; and they, the said party of the first part, shall also have the use of the land herein before described, and also the use of the lot lately bought of William Minton, containing fifty-two acres, for farming purposes, during said term free of rent, on condition of keeping said building and said land in proper and husbandlike order, condition and repair. And the said party of the first part covenant and agree to and with the said David Thomas to work the said mine or mines in a proper and systematic manner, to the satisfaction and approval of the overseer appointed by the said David Thomas, and to deliver the same, together with the whim, chains, and apparatus, in proper working order and condition, also the building in proper order and repair, and the land in proper order, at the end of said term.

"And in case the said party of the first part, the survivors or survivor of them, shall neglect or refuse to make the proper selection of the ore from rock, dirt, and impurity, then the same shall be so selected by the said

overseer, at the cost and expense of the said party of the said first part. And it is expressly understood, by and between the said parties to this agreement, that in case the said party of the first part, the survivors or survivor of them, shall neglect to raise the full quantity of 5000 tons of ore in the first year of this agreement, then this contract shall cease and determine on the first day of May, 1851, and they shall be held to surrender the possession of the premises on the said 1st May, 1851. Should, however, the ore run out, or the said party of the first part have to contend with an extraordinary quantity of water that cannot be controlled by horse power, then the said David Thomas agrees to waive his claim to the said full quantity of ore in said first year. And the said parties to these presents do hereby, for the full, fair, and entire performance of all and every the condition, covenant, terms, and stipulations herein contained, by them respectively made and entered into, bind themselves, each to the other, in the penal sum of $1000, firmly by these presents.

In witness whereof," &c.

Upon the interpretation of this agreement, the character of the plaintiffs' possession depended ; it was offered and admitted in evidence upon the trial, and upon its construction the whole case turned.

The cause was tried in the Morris Circuit, before Justice Ogden, April term, 1852, and the jury rendered a verdict of guilty, upon which judgment was afterwards entered for twenty dollars damages.

On the trial, the court charged the jury, that the written agreement offered in evidence by the plaintiffs, executed by David Thomas, of the one part, and John Wallace and others, of the other part, gave to the plaintiffs such exclusive possession of the *locus in quo* as to enable them to sustain this action of trespass against the defendant, though he entered under the said David Thomas; and that the plaintiffs were entitled to recover, as damages,

such profits as the jury believed they would have realized by raising the ore, which was raised by the defendant at the rate of one dollar and thirty one cents per ton; and that there was evidence from which the jury could lawfully find that profit to be six cents per ton, and that damage should be allowed, as well for the ore raised before notice to the defendant as after.

To this charge of the court, the defendant below excepted, and a bill of exceptions was allowed and sealed accordingly, and errors assigned thereon.

The case was argued at February term, 1856, before the CHIEF JUSTICE, and OGDEN, ELMER, and HAINES, Justices, by *Whelpley*, for the plaintiff in error, and *Vanatta*, for defendants.

*Whelpley* cited *Bac. Abr.* "*Lease*"; *Bouvier's Law. Dic.* "*Lease*"; *Cruise Dig. Ibid*; 4 *Kent's Com.* 85; 1 *Greenl. Ev.* § 207, 208; 5 *Johns. R.* 151, *Bradish* v. *Schenck.*

*Vanatta* cited 1 *Chit. Pl.* 174; 3 *Kent's Com.* 460, 461; *Dexter* v. *Manley*, 4 *Cush.* 14; *Buller's N. P.* 156; 18 *Eng. Law and Eq.* 411; *Keyse* v. *Powell*, 2 *Ellis & Black.* 132; 3 *Kent's Com.* 378; *Harker* v. *Birbeck*, 3 *Burr.* 1556; *Wilson* v. *Mackreth, Ibid* 1824; 1 *Man & Grang.* 604, *Taylor* v. *Parry*; 9 *Mees. & Wels.* 672, *Wild* v. *Holt*; 1 *Chit. Pl.* 500, 501; 2 *Greenl. Ev.* § 625; 2 *Parsons on Cont.* 460; *Masterton* v. *Mayor of Brooklyn*, 7 *Hill* 61; 13 *Howard*, 307; 20 *Eng. Law and Eq.* 410; 5 *Mees. & Wels.* 351 *Martin* v. *Porter.*

The CHIEF JUSTICE. The first error assigned is, that the judge instructed the jury that the plaintiffs had such exclusive possession of the *locus in quo*, as to enable them to maintain trespass against the defendants. That the plaintiffs were in the actual possession of the premises is not disputed. The character of that possession is the point in controversy. The plaintiffs entered into possession of the

premises under an agreement executed by David Thomas, of the one part, and the plaintiffs, of the other part, on the 7th of May, 1850. The defendant entered and committed the alleged trespass under the said David Thomas, during the continuance of his agreement with the plaintiffs. The defendant insists that the plaintiffs had not such exclusive possession of the premises as to enable them to maintain trespass against Thomas, or against the defendant, who entered by his authority. The character of the plaintiffs' possession must depend upon the interpretation given to the agreement under which they entered. The agreement is clearly not a lease of the mine. It is, in terms and effect, an agreement on the part of the plaintiffs to raise a certain quantity of ore per annum, for two years, at a stipulated price per ton. The plaintiffs pay no rent for the mine. They are paid for their labor. In addition to the price per ton to be paid for their services, they are to be furnished with whim, chains, timber, and plank required for their operations, the use of a dwelling house and smith shop on the premises, a stable, the tops of trees for fuel for their hands occupying the house, the use of the land and of another tract of fifty-two acres, for farming purposes during the term, free of rent. In regard to the land and buildings, the agreement may be construed as a lease, the defendants paying rent by their labor in the mine. But admitting it to be technically a lease of the soil, or surface, the lease clearly does not extend to the mine. The agreement distinguishes between the land and the mine, the former going to the use of the plaintiffs for agricultural purposes, while the latter is to be worked for the benefit of the owner, in a manner totally repugnant to its use by the plaintiffs as leased property. The general principle, therefore, that a lease of land carries with it the mines upon the land, can have no application. The rule only applies where the contract relates

to the land generally, without exception or reservation. *Keyse* v. *Powell*, 2 *Ellis & Black.* 132.

Whatever may be the precise character of the contract, whether technically a lease or not, the plaintiffs were clearly entitled to the exclusive possession of the land, or surface, of the tract. They are, by the agreement, to have the use of the house and the use of the land. Their possession of one is as exclusive as that of the other. Thomas reserved no right of entering upon the land for the purpose of mining or for any other purpose, except for carrying away the ore, and also (it would seem by necessary implication) for cutting timber for the use of the mine. The plaintiffs' possession of the surface alone would be sufficient to maintain this action, though it be admitted that they had not the exclusive possession of the mine itself. There was, technically, a breach of the plaintiffs' close, an entry upon their possession by the defendants without right.

But the plaintiffs had also, under their contract, the exclusive possession of the mine itself. This construction of the contract is necessary to enable the plaintiffs to execute their part of the agreement, and is in accordance with the obvious intention of the parties. The plaintiffs were to work the mine; they were bound to raise five thousand tons of ore per annum; they had the entire mine (so far at least as it had been opened) to carry on their operations. They were entitled, under their contract, to work without let or molestation from others. True, the mines were to be worked in a proper and systematic manner, to the satisfaction and approval of the overseers appointed by the owner. But this no more gives the owner joint possession of the mine, than would a contract on the part of a tenant, to work a farm in a proper manner and with a suitable succession of crops, to be approved by the landlord, give the landlord joint possession of the farm.

The plaintiffs, moreover, covenant to deliver the mines, with the whim, chains, and apparatus in proper working order and condition, also the building and the land in proper order, at the end of the term. They also covenant, upon failing to raise the stipulated quantity of ore, to surrender the possession of the premises on the 1st of May, 1851. This language clearly indicates that, according to the understanding of the parties, the possession of the mine, as well as of the land and buildings, was in the plaintiffs.

There was, therefore, no error in the charge of the court, that the plaintiffs had such exclusive possession of the *locus in quo* as to enable them to maintain trespass against the defendant for the wrong complained of.

The second and remaining errors assigned are that the judge erred in his charge to the jury touching the measure of damages. The jury were instructed that the plaintiffs were entitled to recover, as damages, such profits as the jury believed they would have realized by raising the ore, which was raised by the defendant, at the rate per ton which the plaintiffs were entitled to receive under their contract. This charge manifestly assumes, as the true interpretation of the contract, that the plaintiffs not only had the possession of the entire tract for agricultural purposes, but that they also were entitled to open new mines or shafts anywhere upon the tract where ore could be found. But this is neither within the express terms or natural import of the agreement. The plaintiffs' covenant to raise not less than 5000 tons of ore per annum, out of the mines on the land and premises of Thomas Earp and Theodore Mitchell, known by the name of the Hance and Dickerson mine, containing forty-one acres, more or less. By the terms of the contract, the plaintiffs are entitled to raise the ore out of the mines on the tract of forty-one acres. Now a mine, properly speaking, is the pit or excavation in the earth from which the ore is taken. The

term is certainly used to include the bed or vein of ore into which the pit enters, so far as may be necessary to the working of the mine; and the whole series of shafts and subterranean passages and chambers connected with it. But neither in ordinary parlance, nor in strict technical language, is a mine understood to indicate the entire ore bed with which the shaft may be connected. As by a quarry we understand not an indefinite extent of stone or rock which may be worked, but the spot where the rock is quarried. The ore may extend indefinitely, but the mine is the pit from whence it is extracted.

There is no authority given in the contract to the plaintiffs to open new mines, or to sink new shafts or slopes, except so far as such shafts or slopes may have been necessary to the proper and successful working of the mines already opened.

That this is the true interpretation of the contract, as understood by the parties themselves, is abundantly manifest from the evidence in the cause. Almost immediately after this contract was made, one of the contracting parties, having separated from his associates, opened a shaft near the mine where the plaintiffs were at work, without objection on their part. The contract for opening the shaft now in controversy was offered to one of the plaintiffs, who declined to undertake it, except at a price which the owner refused to pay. The contract was then made with the defendant, in the presence of one of the plaintiffs, and over $350 was paid for sinking the shaft. The work was carried on under the immediate observation of the plaintiffs, and without objection or question on their part; and it was not until the mine had been opened, and was proving remunerative, that the plaintiffs attempted to interfere with the right of the defendant to carry on the work. This evidence, if not competent to establish the defence of leave and license under the pleadings in the cause, is both competent and material, as show

ing the true meaning of the contract and the understanding of the parties in relation to it. *Chapman* v. *Bluck*, 4 *Bing, N. C.* 187 ; *Chit. on Con.* (*9th ed.*) 88.

The evidence shows no connection whatever between the shaft sunk by the defendant, and the vein or bed of ore with which the plaintiffs' mine was connected.

But, admitting that the shaft sunk by the defendant had connected with the same ore bed in which the plaintiff was at work, it could in no wise have injured the plaintiff, unless it appeared in evidence that it interfered with the beneficial working of the plaintiffs' mine. But there is no evidence that it interfered at all with the plaintiffs' legitimate operations ; that they ever could or would have opened the mine to that spot, or, if they had done so, that the operation would have proved remunerative. So far as appears from the evidence, the expense of opening the slope by the defendant, was greater than all the profits which the plaintiffs would have realized from that time until the expiration of their contract, had they raised all the ore which they were bound to raise during that time, and far more than they had raised at any other period of their contract.

The plaintiffs, under the evidence, were entitled to but nominal damages. In this particular, the charge was erroneous. The judgment must therefore be reversed, and a *venire de novo* awarded.

ELMER and HAINES, Justices, concurred.

OGDEN, J. This was an action of trespass *quare clausum fregit*, brought in the Morris County Circuit Court by Wallace and McKenna against Shaw. On the trial, in April, 1852, the jury rendered a verdict of guilty, whereon judgment was afterwards entered for twenty dollars damages.

Upon the return of the writ of error, several errors were assigned on the record, but those relied upon in the

argument referred to two principal matters, contained in the charge of the court below.

1st. As to the right of the plaintiffs to recover in this form of action.

2d. As to the mode of admeasuring damages.

The premises, upon which the acts complained of were committed by the defendant below, had been under the control of an association, called "the Crane Iron Company." On the 7th of May, 1850, David Thomas, an agent of that company, entered into an agreement in writing, under seal, with the plaintiffs below, respecting the said premises, which was to continue in force for two years from the first day of that month. The plaintiffs entered upon their work under the agreement, and continued their operations until June, 1851, when the defendant, without their permission, commenced doing work upon the same premises, which resulted in the injurious acts of which the plaintiffs complained.

The case turns upon the nature and true construction of the contract in writing, and upon the acts of the plaintiffs under it. If it gave the plaintiffs a right to the possession of the *locus in quo* for all purposes for which it was valuable, and such possession followed its delivery, and has been unlawfully invaded by the defendant, the action, in its present form, is well brought; but if no such possession could lawfully follow the agreement, as would support trespass against a wrongdoer, the judgment should be reversed.

The plaintiffs, for a compensation to be paid to them for so doing, agreed, with the grantors named in the instrument, to raise to the mine banks not less than 5000 tons per annum of clear and merchantable iron ore out of the mines, on certain lands and premises described in the paper, containing forty-one acres, they having the privilege of entering immediately upon the premises, and commencing their operations. They likewise were to use

and occupy the dwelling house and blacksmith shop which were upon the premises, and to have a stable provided for their use, and the tops of the trees that should be felled upon the premises for the use of the mine, for fuel for their hands, and to have the use of the forty-one acres; and also the use of a Minton lot of fifty-two acres for farming purposes, during said term, free of rent, on condition of keeping the said buildings and the land in proper and husbandlike order, condition and repair. The mine and mines were to be worked in a proper and systematic manner, to the satisfaction and approval of an overseer, to be appointed by the other party, and were to be delivered up, together with the machinery furnished by the other party, in proper working order and condition; also the buildings in proper order and repair, and the land in proper order, at the end of the said term. It is further stipulated in the agreement, that in the event of the plaintiffs neglecting (except for the causes therein stated) to raise the quantity of ore named in the first year, then the contract to cease and determine on the 1st of May, 1851, and that they should be held to surrender the possession of the premises, on the 1st day of May, 1851. The ore, when raised to the surface, was to be carted by the owners of the premises to the weighing scales at the Morris canal.

It was not denied, upon the trial, that the plaintiffs, before the commission by the defendant of the acts complained of, enjoyed all the property and rights conferred on them by the agreement as fully as they were entitled to enjoy them, nor was it disputed that, at the time the alleged trespasses are charged to have been committed, they held as separate and sole possession of the premises as the agreement secured to them; but it was insisted by the defendant that the instrument could not entitle the plaintiffs to such an exclusive possession of the *locus in quo* as would enable them to sustain trespass.

During the term, the defendant, by the authority and employment of the grantor of the plaintiffs, entered upon the premises for the purpose of mining, ran one or more slopes and shafts into the earth, in search of ore, one of which was immediately under a shaft which had been worked by the plaintiffs, and up to the 10th of September, 1851, the date of the commencement of the suit, had raised 333 tons of ore to the surface. While he was raising the ore, he forbid Wallace working there, and they quarrelled about it. When the apertures were opened, the plaintiffs gave notice that they claimed the right to raise the ore out of them under their contract. The judge charged the jury, that the written agreement offered in evidence by the plaintiffs, coupled with the acts done by them, gave such exclusive possession of the *locus in quo* as would enable them to maintain the action of trespass against the defendant, although he entered upon the property under the agent of the grantors to the plaintiffs. Also, that the plaintiffs were entitled to recover, as damages, such profits as the jury believed they would have realized by raising the ore, which was raised by the defendant at the rate of one dollar and thirty-one cents per ton ; and that there was evidence from which they could lawfully find the profit to be six cents per ton ; and that damages should be allowed as well for the ore raised before notice to the defendant as after.

The defendant's counsel excepted to all the matters contained in the charge, and errors have been separately assigned upon each of the exceptions.

The case of *Harker et al.* v. *Birkbeck et al.*, cited from *Burrows* 1556, bears directly upon the question involved in the first assignment. It was an action on the case, brought by a person holding the sole liberty and privilege of digging for and getting lead ore, for his own benefit, upon a certain plot of ground belonging to another. The complaint was, that while the plaintiffs were so entitled, the

defendants raised a quantity of ore out of those premises. The persons from whom the plaintiffs derived their liberty r served the right of inspecting the works by an agent whenever they pleased. The defendants insisted, on the trial, that the nature of the plaintiffs' right was such that, for the alleged infringement and violation of it, they could only maintain trespass. A verdict was taken for the plaintiffs, subject to the opinion of the court in banc. Upon the coming in of the *postea*, the court, after hearing an argument, resolved that the plaintiffs were in possession of the mine, having actually wrought it, and that the injury done was a trespass; that whoever is in possession may maintain an action of trespass against a wrongdoer to his possession. The *postea* was ordered to the defendants, and the plaintiffs were nonsuited.

*Prima facie*, the tenant of the surface is tenant of the minerals, and so long as both are held under one title, occupation of the surface is in law occupation of the minerals. The surface and the minerals may be severed, and thus become distinct and separate tenements. *Humphries* v. *Brogden*, 12 *Queens B. Rep.* 739. There was no severance in the case before us; the mines were the chief benefit that the plaintiffs acquired by their contract. Their right is different from a mere license to work for minerals, which is not exclusive of the rights of the grantor, because the possession of all the superincumbent land was passed to and held by them. By the true construction of the writing given in evidence in this case, the plaintiffs acquired such a right to the *locus in quo*, when exercised, as entitled them to maintain trespass against any one who, during the two years, should undertake to raise ore out of any mines on the mining tract. The value of their contract was to be realized in the raising of ore. They were bound, under a heavy penalty, to raise annually a fixed quantity; and any persons who, during the term, worked mines upon the tract without their express authority

became trespassers, and damaged their beneficial interest in the agreement.

There is no error in the charge respecting the plaintiffs' right to support the action of trespass.

The remaining question is, whether the jury should have been directed to assess strictly nominal damages, or whether there was evidence before them to support remunerative damages, and whether the measure stated to them by the court was the true standard. Nominal damages are those which are always presumed to follow from the violation of any right or duty implied by law, if none greater are proved. The action was not instituted to try a naked question of right. The plaintiffs were in the enjoyment of privileges conferred upon them by their contract. The aggressions of the defendant did not actually interfere with the prosecution of their work. He had, however, broken the plaintiff's close, and had run a slope and communication from the surface to a vein of iron ore lying under the surface in the plaintiffs' possession. From a view of the evidence, it is apparent that this act was not the trespass for which the plaintiffs sought redress. The defendant continued his aggression by removing the ore thus reached to the surface of the ground for a compensation, thereby interfering with the alleged privileges of the plaintiffs. If such was the legal effect of his mining operations, I am aware of no principle of law that should limit a recovery against him to nominal damages. This is the *gist* of the action. The question is here presented, whether the plaintiffs, while it was in the earth, had such a right in the ore as gave them the privilege of raising it to the surface. If they had, they are entitled to some damages from the defendant for interfering with that right. The contract bound them to raise 5000 tons of ore per annum for two years, under a double penalty, to wit, the forfeiture of the contract at the end of one year, and a money penalty of $1000. Where were they to get it? Out

of the mines on the land and premises described in the agreement. They were put into actual possession of those premises, and had a right to fulfil their engagement by the delivery of any ore which could be approached therefrom. Were they restricted by the agreement to working shafts already opened to the mineral veins, or could they open new shafts, and disembowel from the earth ore thus reached?

If the term "mines," as employed in the contract, is to be critically defined, pits or excavations in the earth from which metallic ores are taken by digging, then the plaintiffs' rights were limited to working through the openings that had been made before the paper was executed. But if, in the use of the term, the parties may be fairly taken to have meant the veins or deposits of ore that might be found under the superficial surface of forty-one acres, then the right to reach all those deposits was vested in the plaintiffs for the period of two years. If, in such exercise of their right, the plaintiffs could not have been held answerable for waste, the reversioners had no right, during the term, either to take out any ore themselves, or to authorize another to do it. It could not be foreseen that the plaintiffs would not require that identical deposit for making good their engagement. I am clearly of opinion that the latter was the intention of the parties, and that such is the plain and natural interpretation of the contract.

As, in this view of the case, the jury were not limited to nominal damages, and if the sum of twenty dollars should, on writ of error, necessarily be considered as compensatory, could the court below have suggested a more moderate rule than that which was embraced in the charge.

In *Waters et al.* v. *Towers et al.*, in 20 *Law and Eq. Rep.* 410, the plaintiffs, in an action for a breach of contract, claimed as damages the amount of profit they would

have made if the contract had been fulfilled. Alderson, baron, said, "If reasonable evidence be given that the amount of profit would have been as claimed, the damages may be assessed accordingly." If the loss of profit may be considered by a jury in an action on contract, may it not with equal propriety admeasure damages in an action of trespass, where the defendant, by his wrongful act, has prevented a party from applying his industry upon the property of another, whereby he would have made a fixed and ascertainable profit.

It appeared in evidence that Shaw received ten shillings and sixpence per ton for raising the ore; that the plaintiffs, by the original contract, were to receive ten shillings; but finding that the price would not pay more than the expenses of the work, in April, 1851, their compensation was increased to $1.31. Upon these proofs, the profits of the plaintiffs could not be put at more than sixpence per ton, which amount was also the profit per ton made by the defendant, if he raised the ore as cheaply as the plaintiffs had done. He offered no proof upon that point.

The charge was, " that the plaintiffs were entitled to recover, as damages, such profits as the jury believed they would have realized by raising the ore which was raised by the defendant, at the rate of one dollar and thirty-one cents per ton, and that there was evidence before them from which they could lawfully find that profit to be six cents per ton."

The gauge was so limited that I think the defendant has no just reason to complain of its application.

Again. If the plaintiffs are entitled to receive anything by way of compensation, they were not bound to give the defendant actual notice of their rights in the premises.

Finding no error in the charge of the court below, I think that the judgment should be affirmed, with costs.